```
              IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF PENNSYLVANIA


ANGELA HATFIELD,                )
                                )
        Plaintiff,              )
                                )
     v.                         )       Civil Action No. 08-849
                                )
                                )
UNITED PARCEL SERVICE, INC.,    )
                                )
        Defendant.              )
```

REPORT AND RECOMMENDATION

I. Recommendation

Presently before the court is Defendant, United Parcel Service's ("UPS"), motion for summary judgment as to Plaintiff, Angela Hatfield's ("Hatfield"), claim that she suffered employment discrimination because of her sex in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, et seq., and the Pennsylvania Human Relations Act, 43 P.S. § 951, et seq. ("PHRA") and, because of her age, in violation of both the Age Discrimination in Employment Act, 29 U.S.C. § 621, et seq. ("ADEA") and the PHRA.[1] It is respectfully recommended that UPS's motion for summary judgment (Docket No. 20) be granted.

---

[1] In her Brief in Opposition to Defendant's Motion for Summary Judgment, Hatfield informs that, in light of the United States Supreme Court's recent decision in Gross v. FBL Financial Services Inc., 129 S.Ct. 2343 (2009), she does not contest entry of summary judgment in UPS's favor on her age discrimination claims.

II.   Report

Under Fed.R.Civ.P.56(c), "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law[,]" summary judgment should be granted.  The threshold inquiry is whether there are any genuine factual issues that can be properly resolved only by a finder of fact because they may reasonably be resolved in favor of either party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250(1986).  A court may grant summary judgment if the non-moving party fails to make a factual "showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corporation v. Catrett, 477 U.S. 317, 322(1986).  In making this determination, the non-moving party is entitled to all reasonable inferences.  Lawrence v. City of Philadelphia, 527 F.3d 299, 310 (3d Cir. 2008).  A court may not, however, make credibility determinations or weigh the evidence in making its determination.  Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150(2000).

    A.   Factual and Procedural History

Throughout her twenty-year employment with UPS, Hatfield held twelve different job assignments at seven different UPS locations. All of Hatfield's assignments were within the company's Laurel Mountain District which encompasses Western Pennsylvania,

West Virginia, and Cumberland, Maryland. Hatfield began employment with UPS as a temporary driver helper in 1986. She became a permanent employee in 1987 and, in January 1988, received a promotion to Supervisor. Hatfield worked primarily in Package Operations during the next three years, although she occasionally was given special assignments.

UPS often changes job assignments of its managerial employees. According to the UPS Policy Book, management employees are transferred as per the need of the company and to broaden the experience of the employee. App. to Def.'s Mot. for Summ. J., Ex. H. Management employees also complete forms relative to their career plans which include a statement of their willingness to relocate. Additionally, the company compiles a "Ready Now" list, consisting of the names of employees ready to advance to the next level of management. Decisions concerning management job assignments within the various UPS districts are generally made at the bi-annual "peoples meeting" or by the Talent Management Committee ("TMC") as positions become available.

In 1991, Hatfield was promoted to a Grade 16 Business Manager and, for a ten-year period thereafter, she was assigned to manage three different West Virginia Package Centers, requiring relocation in each instance.

In 2001, Hatfield was laterally transferred to the Laurel Mountain District's Human Resources Department in New Stanton, Pennsylvania as the Community Service Manager. When this position

was eliminated after one year, Hatfield returned to Package Operations as Business Manager of the Steel Valley Center in Pittsburgh, Pennsylvania. The next year, Hatfield became Business Manager of the larger package center in Pittsburgh known as the City North Center. The City North Center was reputed to be difficult to manage because of a challenging labor climate.

The performance of the City North Center declined under Hatfield's tenure and UPS decision-makers elected to name Hatfield as the Training and Development Manager in the New Stanton Human Resources Department. In February 2006, however, Hatfield's Human Resources position was eliminated as a result of a cost-cutting initiative.

Coincident with the elimination of the Training and Development position was the creation of a Service Excellence Manager in the Laurel Mountain District and Hatfield received this assignment. In this capacity, Hatfield reported to the Business Development Department Manager, Tony Jones. Both Hatfield and Jones testified that their working relationship was strained. Jones claimed that Hatfield was not forthright in accounting for her time and sometimes failed to perform in accord with his expectations; Hatfield believed that Jones thwarted her ability to perform successfully and was non-responsive to her career concerns.

In November 2006, UPS eliminated the Service Excellence Manager position throughout the company. At this point, Hatfield was temporarily assigned as a Helper Coordinator at the Bethel Park

Package Center to help with the increased volume during the peak holiday season.

When the 2006 peak season ended, there were three Laurel Mountain Grade 16 Business Managers - Hatfield, a 52 year-old female, Doris Smith, a female in her thirties, and Charles Swink, a 42 year-old male - seeking reassignment, but there were only two Grade 16 vacancies within the District. The two Business Manager vacancies were described as an BQA auditor in the Industrial Engineering Department and a Preload Manager at the large Beaver Avenue facility in the Operations Division. The TMC, consisting of Bill Caplan, the District Manager, Brian Staub, the District Human Resources manager, Art Duggan, the District Operations Manager, Fred Rowe, the District Controller, and Tandy Bailey, the District Industrial Engineering Manager, assigned Ms. Smith to the Auditor Position and Mr. Swink to the Preload Manager job.

UPS decision-makers were somewhat challenged in its attempt to find a position for Hatfield. There were no Grade 16 Business Manager openings in either the Business Development Department or in any of the thirty-three package centers in the Laurel Mountain District. It was ultimately decided that Hatfield would be assigned to manage the package center located in Elkins, West Virginia. The management of that facility had previously been overseen in tandem with management of the Clarksburg, West Virginia package center. In UPS's view, dividing the management of the two centers would benefit the performance of both facilities and would

secure a desirable position for Hatfield, who resided in West Virginia, and where she could remain at her current grade and salary level.  UPS acknowledged that the transfer would require Hatfield to relocate, but offered that the career plan form completed by Hatfield in 2005 indicated a willingness to relocate.  Also, as the bulk of Hatfield's tenure with UPS was concentrated in package centers operations, the Elkins assignment was considered to be commensurate with her prior experience.  The smaller size of the Elkins facility was likewise a factor as Hatfield did not perform successfully when previously assigned to the large City North Package center located in Pittsburgh.

   The record contains conflicting versions of the mechanics of the decision-making process as regards Hatfield's new position, particularly as to who made the decision.  Duggan testified that Bill Kaplan, the District Manager, communicated that it was Duggan's responsibility to place Hatfield in a Business Manager position in the Laurel Mountain District.  Duggan responded to this edict as follows: "I was told that she was coming in, so it really would have been myself finding a home and making a recommendation to Brian [Staub, the Laurel Mountain District Human Resources Manager and TMC member], which probably would have shared it with [Caplan], or perhaps I did, or perhaps there was even discussion [among] the three of us."  (Duggan Dep. 98, April 14, 2009).  Brian Staub, in contrast, testified that the decision to move Hatfield to Elkins was a collective one: "As a TMC, when we

sat down, we said, you know, what's a good fit? We really thought about [Hatfield] and trying to find a good fit for her as well." (Staub Dep. 58, April 7, 2009). In the face of this seemingly contradictory testimony, Hatfield urges the court to find that the decision to transfer her to the Elkins package center was made solely by Duggan, and not by the entire TMC, in violation of UPS policy. As the facts are viewed favorably to Hatfield, this version of the employment decision is assumed to be true.

In any event, when Duggan and Staub informed Hatfield of her new assignment, Hatfield expressed disappointment. Her stated cause for dismay was the inconvenient location of the Elkins facility in the context of her relationship with her boyfriend, a United States Congressman. As she described, " I did not wish to relocate 300 some miles from my home. And I was happy in my personal life, and I had sacrificed for years and I wasn't willing, at my age, to do that again." (Pl.'s Dep. 82-83, April 2, 2009). Hatfield therefore inquired about the possibility of an assignment to Washington, D.C. and requested some time to think about the Elkins assignment and discuss the move with her boyfriend.

A few days later, Hatfield, Duggan, Staub, now joined by Rowe, reconvened. Hatfield related that she did not want the Elkins assignment and asked what other positions would be available to her. Hatfield was informed that, in light of her unwillingness to relocate, her only other option was as an on-car supervisor. While this assignment would not require relocation, it would be a

demotion in grade and salary.  Hatfield decided that she was unwilling to compromise her personal life or accept a demotion and, on January 25, 2007, she resigned from UPS.

On July 2, 2007, Hatfield filed a charge of age and sex discrimination with the Equal Employment Opportunity Commission ("EEOC") and requested dual filing with the Pennsylvanian Human Relations Commission ("PHRC").  The EEOC dismissed the charge and issued Hatfield a right to sue letter.

On June 2, 2008 Hatfield filed the instant lawsuit alleging claims of sex and age discrimination culminating in her constructive discharge from UPS.  Hatfield now concedes that her age discrimination claims are not cognizable, but, as regards her sex discrimination claim, the complaint alleged that the disparate treatment was manifested in two ways.  First, Hatfield averred that, shortly after she was assigned to report to Tony Jones, he began to discriminate her on the basis of her sex.  Hatfield claims that Jones, inter alia, unreasonably objected to her working hours and made inappropriate comments about her work ethic at an employee gathering.  She also believes that, although Jones was not a member of the TMC, his negative input to that group regarding her employment performance was a factor in the decision to assign her to the Elkins package center.  Hatfield now explains that she is not asserting a hostile work environment claim based on disparate treatment by Mr. Jones, but rather has offered this evidence to demonstrate her "emotionally charged mindset" relative to her

decision to resign from UPS.  (Pl.'s Brief 14).

Second, although the allegations are far less detailed than Hatfield's description of Jones's discriminatory activity, the complaint can be fairly read to state a claim that Charles Swink's assignment to the Beaver Avenue Preload Manager position was the result of illegal sex discrimination.  In 2006, Swink was a Grade 16 Operations Manager assigned to the UPS facility in New Stanton, Pennsylvania.  By all accounts, Swink was an exemplary employee; accordingly, during the 2006 peak season, he was sent to Richmond, Virginia, as a hub manager on a trial basis.  Apparently, if Swink performed satisfactorily, he would have been transferred to Roanoke and promoted.[2]  While the TMC was confident in Swink's ability to manage a hub, they were concerned that Swink's family would resist relocation and he was asked specifically by the TMC prior to the assignment whether he would be willing to relocate.  The record is unclear as to Swink's verbal response to the relocation query, however, he did accept the assignment to Roanoke.  It is undisputed that the TMC initially expected that Swink would remain in Roanoke after the conclusion of the peak season temporary assignment and assume the hub manager in Roanoke.  As it turned out, though, Swink was unhappy in Roanoke and his family ultimately decided that they did not want to move.  Therefore, at the conclusion of the peak season, Swink returned to the Laurel

---

[2]  Although a hub manager is a Grade 18 position, Swink, a Grade 16 employee, did not receive a promotion to that level during his trial period in Roanoke.

Mountain District and was eventually assigned to the Beaver Avenue Preload Manager position.

Hatfield claims that Swink was afforded preferential treatment by the TMC regarding his job assignment because his unwillingness to relocate was accommodated while her similar reluctance was disregarded. Hatfield deemed it inconsequential that her career plan indicated a willingness to relocate, because Duggan testified that he did not consult her plan in deciding upon her assignment. While Hatfield acknowledged that she never advised UPS directly concerning her unwillingness to relocate, she claimed that, prior to her February 2006 departure from the Human Resources Department, she had removed her name from the "Ready Now" list to communicate her changed status concerning relocation.

After the close of discovery, UPS filed a motion for summary judgment alleging that Hatfield cannot demonstrate that there is any issue of material fact related to her claim that she was constructively discharged.

B.  Prima Facie Case

In order to establish a prima facie case of sex discrimination under Title VII and the PHRA[3], Hatfield must demonstrate that she: 1) is a member of a protected class; 2) performed her job in a satisfactory manner; 3) suffered an adverse employment action; and, 4) that non-members of the protected class

---

[3] Courts construe Title VII and the PHRA consistently. Atkinson v. LaFayette College, 460 F.3d 447, 454 n.6 (3d Cir. 2006).

were treated more favorably.  McDonnell Douglas Corporation v. Green, 411 U.S. 792 (1973); Duffy v. Paper Magic, Inc., 265 F.3d 163, 167 (3d Cir. 2001).  Hatfield is able to establish the first two elements of the prima facie case.  However, the parties join issue over whether Hatfield can demonstrate that she has suffered an adverse employment action and/or whether a male manager, namely, Swink, received favorable treatment.

       1.  Adverse Employment Action - Constructive Discharge

An adverse employment action under Title VII involves activity by an employer that is "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment."  Storey v. Burns International Security Services, 390 F.3d 760, 764 (3d Cir. 2004)(citation omitted).  Examples of adverse employment actions include termination, cuts in pay or benefits, circumstances amounting to constructive discharge, or changes that affect future career prospects.  King v. City of New Kensington, No. 06-1015, 2008 WL 4492503, at *10 (W.D.Pa. September 30, 2008).  See also Connors v. Chrysler Financial Corporation, 160 F.3d 971, 974 (3d Cir. 1998)(evaluating constructive discharge claim as adverse employment action).

To establish a constructive discharge claim an employee must demonstrate that the employer knowingly permitted conditions of discrimination in the workplace "so intolerable that a reasonable employee would be forced to resign."  Levendos v. Stern Entertainment, Inc., 860 F.2d 1227, 1232 (3d Cir. 1988)(citation

omitted). An employee's subjective perceptions of unfairness or harshness do not govern a claim of constructive discharge. Gray v. York Newspapers, Inc., 957 F.2d 1070, 1083 (3d Cir. 1992). Instead, the focus is on the reasonable person, Clowes v. Allegheny Valley Hospital, 991 F.2d 1159, 1162 (3d Cir.1993), and courts employ an "objective test to determine whether an employee can recover on a claim of constructive discharge." Duffy, 265 F.3d at 167.

Courts can consider a number of factors as indicative of constructive discharge: (1) a threat of discharge; (2) suggestions or encouragement of resignation; (3) demotion or reduction in pay or benefits; (4) involuntary transfer to a less desirable position; (5) alteration of job responsibilities; (6) unsatisfactory job evaluations. Clowes, 991 F.2d at 1161.

Hatfield contends that two of the six factors indicative of constructive discharge are present in her case - she was transferred to a less desirable position, and, when she inquired about the possibility of a more geographically desirable assignment, she was offered a demotion in return.

"Purely lateral transfers" do not, standing alone, constitute adverse employment actions. Langley v. Merck & Company, Inc., 186 Fed. Apex. 258, 260 (3d Cir. 2006)("[M]inor actions, such as lateral transfers and changes of title and reporting relationships, are generally insufficient to constitute adverse employment actions"). However, a decision to transfer an employee,

even unaccompanied by loss of pay or benefits, may, in some circumstances, constitute an adverse employment action sufficient to establish that element of a prima facie discrimination case. Jones v. School District of Philadelphia, 198 F.3d 403, 411-12 (3d Cir. 1999). For example, a plaintiff might be able to meet the adverse employment decision requirement by showing that he was transferred to a "dead-end" job that had effectively been eliminated prior to the transfer. See Terre v. Casio, Inc., 42 F.3d 825, 831 n.7 (3d Cir. 1994). Another transfer that constituted a constructive discharge occurred in Goss v. Exxon Office Systems Company, 747 F.2d 885 (3d Cir. 1984). In that case the employer continually questioned a saleswoman about her plans to start a family and whether she could successfully balance home and career. When the employee returned to work after having suffered a second miscarriage, she was informed that she must either except a transfer to a less lucrative sales territory or resign. The Court of Appeals for the Third Circuit agreed with the district court that, under these circumstances, a reasonable person in the employee's shoes would have felt compelled to resign. Id. at 888.

For a transfer to be tantamount to an adverse employment action, however, "it must be adverse in the right way." Fallon v. Meissner,66 Fed. Apex. 348, 352 (3d Cir. 2003). The hardship must be job-related and cannot be reasoned by the employee's personal preferences. Id. See also DiIenno v. Goodwill Industries of Mid-Eastern Pennsylvania, 162 F.3d 235, 236 (3d Cir. 1998)(desire to

live and work in another city is not job-related).  Accord Grande v. State Farm Mutual Automobile Insurance Company, 83 F.Supp.2d 559, 564 (E.D. Pa. 2000)(desire to work in particular location is not job-related factor to support claim of constructive discharge).

In Cherchi v. Mobil Oil Corporation, 693 F.Supp. 156 (D.N.J. 1988), the court discussed whether a transfer requiring relocation could constitute constructive discharge.  In that case, an employee expressed an unwillingness to relocate from New York to Baltimore because his mother was hospitalized, his significant other was unwilling to move, most of his family resided in the New York area, he would lose money if he sold his current house, and because he perceived the Baltimore position as inferior.  The Court found that neither Cherchi's perception that the Baltimore position was a lesser one nor his various personal reasons for not wanting to move would "constitute the intolerable conditions which must be present to support a finding of constructive discharge." Id. at 162.

Similarly, Hatfield has failed to produce any evidence that UPS's decision to assign her to the Elkins facility was an employment decision so objectionable that she was compelled to resign.  Hatfield revealed in her deposition that the reason for her negative reaction to the Elkins assignment was the fact that it would require relocation and would impact unfavorably on her personal happiness.  In fact, she stated unequivocally that she "was willing to take any job . . .  other than relocation." Pl.'s Dep.

at 110. Although Hatfield's Counterstatement of Facts and Additional Material Facts states that she had responsibility for the entire Laurel Mountain District when she held the Volume Retention Manager position and her brief suggests that the assignment to the smaller Elkins facility would represent a backward step rather than a stepping stone as regards her career with UPS, Hatfield's own words evidence that these considerations did not reason her decision to resign from UPS.[4] Rather, she resisted the relocation because she was unwilling at this stage in her life to exalt career over personal happiness. UPS cannot be called to task under the employment discrimination laws because its employment decision did not coincide with Hatfield's personal agenda. See Gray, 957 F.2d at 1083 (discrimination laws "not intended to handcuff managers" to maintain status quo).

Hatfield also claims that she was constructively discharged when she was offered a demotion to a Grade 14 supervisor position as an alternative to relocation to the Elkins facility. Hatfield correctly identifies a demotion as one of the factors enumerated in Clowes which could give rise to a claim for constructive discharge, however, Hatfield was not demoted. Rather,

---

[4] In any event, Hatfield's statement that transfer to a smaller facility with a different range of responsibility equates to a negative in her career advancement is unsupported. Subjective perception that a job is inferior is not adequate to establish constructive discharge. Cherchi, 693 F. Supp. at 162.

pursuant to Hatfield's request that UPS find an assignment that would not require relocation, UPS offered the Grade 14 position as an available alternative. Hatfield did not accept the offer, therefore, there is no factual basis for her claim that she was demoted.

Based on the undisputed evidence that Hatfield resigned from UPS because she did not want to relocate, she failed to demonstrate the existence of a genuine issue of fact that UPS perpetrated or permitted intolerable conditions of employment such that it was foreseeable that a reasonable employee would have felt compelled to resign rather than endure them. Failing on her claim of constructive discharge, Hatfield has cannot show that she suffered an adverse employment action, a necessary component to her prima facie case. Consequently, it is recommended that UPS's motion for summary judgment be granted.

C. Conclusion

For the reasons stated, the court recommends that UPS's motion for summary judgment(Docket No. 20) be granted. Within the time limits set forth in the attached notice of electronic filing, any party may serve and file written objections to the Report and Recommendation. Any party opposing the objections shall have seven (7) days from the date of service of the objections to respond thereto. Failure to file timely objections may constitute waiver of any appellate rights.

```
                              Respectfully submitted,

                              s/Robert C. Mitchell
                              Robert C. Mitchell
                              United States Magistrate Judge
```

Entered: September 3, 2009